UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JAMES WOODHEAD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 21-189-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| LEXINGTON POLICE OFFICER ZAKARY RIDENER, INDIVIDUALLY, et al., | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

Defendants, Lexington Police Officers Zakary Ridener and Keith McKinney, arrested Plaintiff James Woodhead during a public protest on July 11, 2020. Woodhead was charged in state court with inciting a riot, disorderly conduct, and resisting arrest—those charges remain pending. Woodhead claims that the defendants arrested him in retaliation for protesting and, in the process, placed him in a chokehold and slammed him to the ground. He sued Ridener and McKinney in this Court, alleging that the defendants violated his federal constitutional rights to freedom of speech and to be free from false arrest and excessive force. Woodhead also claims that the defendants committed the torts of state law false arrest and battery.

The parties agree on most of the facts surrounding Woodhead's arrest. To the extent they differ, both officers were wearing body cameras, which recorded the events. Based on all evidence of record, including the undisputed footage from the defendants' body-worn cameras, the undersigned determines that no reasonable juror could conclude that the defendants

battered Woodhead, used excessive force against him, or falsely arrested him. And because there was probable cause for Woodhead's arrest, his claim for First Amendment retaliation necessarily fails. As a result, the Court will grant the defendants' motion for summary judgment.

## I. Background

Woodhead is part of a group called LPD Accountability, which "seek[s] accountability locally within the Lexington Police Department." [Record No. 48, p. 52] LPD Accountability held daily protests in the downtown area of Lexington, Kentucky during the summer of 2020, at least in part, in response to the deaths of Breonna Taylor and George Floyd. Woodhead explained that LPD Accountability has a "horizontal" leadership structure and that he is one of the group's leaders, along with April Taylor. *Id.* at pp. 54-55.

LPD Accountability began their July 11, 2020, protest by gathering in a public plaza near the Fayette County Circuit Courthouse. However, the group quickly moved into the roadway, which had the effect of blocking traffic on Main Street. [Record No. 34-34, Ridener BWC Video 2, 00:20-00:30] Lexington Police Officers Ridener and McKinney were on duty that day. Ridener admonished the group of protestors: "You guys gotta [sic] get out of the road, please" and "we're not blocking the road." [00:30-00:45] McKinney told the group it was "free and welcome" to march on the sidewalk but could not march in the street. [01:00-01:10] But when the group remained in the street, Ridener warned, "If you continue to block the roadway, you will be arrested." He went on to caution repeatedly: "If you stay in the road, you're going to jail." [01:20-01:30]

The group of protestors eventually crossed the street and continued down the sidewalk toward the nearby Lexington Police Department. [Record No. 48, p. 108] Several Lexington

Police Officers, including Ridener and McKinney, observed from across the street. The protestors chanted for several minutes and frequently addressed the officers directly using a megaphone. At one point, Ridener remarked that the protestors had begun "writing numbers on arms . . . to get arrested." [Record No. 34-34, Ridener BWC Video 17, 04:50-05:00] A few minutes later, Ridener stated on his radio that he had just heard April Taylor inform the group that if people were willing to "get in the street and get arrested," it was time to do that. [*Id*. at 09:50-10:02] The officers discussed that the organizers should be arrested for inciting a riot if any of the protestors entered the roadway. [*Id.* at 11:42-11:48]

Shortly thereafter, a protestor walked into the roadway and officers ran out to arrest her. The scene quickly became chaotic, with protestors screaming and swarming the area. Woodhead darted into the turmoil, holding up his phone, presumably recording the events. As he walked in close proximity to police officers, he shouted "fuck all of you!" [*Id.* at 16:20-16:22] Within a few seconds of this utterance, Officer Calvin Mattox began to place April Taylor under arrest. [*Id.* at 16:25] As he did so, Woodhead ran toward Mattox and Taylor, lunging toward Mattox and grabbing at his arm. [*Id.* at 16:25; Record No. 34-34, McKinney BWC Video 16, 24:43] Officer Ridener immediately seized Woodhead from behind and, with McKinney's assistance, took him to the ground and placed him under arrest.

Woodhead was transported to the Fayette County Detention Center ("FCDC") where he was charged with inciting a riot, disorderly conduct, and resisting arrest. He testified during his deposition that he was bruised and scraped but did not recall whether he told the medical staff at FCDC that he had any physical injuries. [Record No. 48, p. 148] However, he did remember "expressing concern to the medical staff about what had happened." He also recalled his blood pressure having been elevated and detention center staff "check[ing] it

multiple times to be able to get a number that they could record." *Id.* at p. 149. Woodhead did not seek subsequent treatment for his blood pressure or any other medical problems.

Woodhead was released from FCDC on his own recognizance later that same day. He and some of the other protestors met at a downtown restaurant to "regroup" and "debrief about what had happened before going home." *Id.* at pp. 150-51.

Woodhead filed this action under 42 U.S.C. § 1983 against Ridener and McKinney, in their individual capacities, alleging that they violated his Fourth Amendment rights to be free from false arrest and excessive force, as well as his First Amendment right to free speech. He also asserts state law claims for false arrest, false imprisonment, and battery.[1] The defendants have filed a motion for summary judgment, arguing that there are no genuine issues of material fact regarding the claims that they violated Woodhead's rights under the United States Constitution or state law. The defendants also contend that they are immune from Woodhead's claims on the basis of qualified immunity.

## II. Standard of Review

Summary judgment is appropriate if there is no genuine dispute with respect to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *International Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 697 (6th Cir. 2020). The

[1] Woodhead also alleged claims for violations of his rights under the Fourteenth Amendment and for declaratory relief, but those claims were dismissed on September 8, 2021. [*See* Record No. 10.]

moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Electro-Mechanical Corp. v. Ogan*, 9 F.3d 445, 448 (6th Cir. 1993).

In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 499 (6th Cir. 2006). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *Donald v. Sybra, Inc.*, 667 F.3d 757, 760-61 (6th Cir. 2012).

When a defense of qualified immunity is asserted, the analysis is somewhat altered. Specifically, the existence of a disputed, material fact does not preclude summary judgment if the defendants cannot be shown to have violated clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).

## III. Discussion

### A. Qualified Immunity

The defendants contend that they are entitled to qualified immunity regarding Woodhead's constitutional claims. This doctrine shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Murray v. Dep't of Corrs.*, 29 F. 4th 779, 786 (6th Cir. 2022). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted)). Accordingly, a defendant is entitled to summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that a defendant violated a constitutional right and the right was clearly established. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

The Court may consider the two factors in any order, but "both must be answered in the affirmative for the plaintiff's claim to proceed." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson*, 555 U.S. at 236). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Although on summary judgment the Court construes the facts in favor of the plaintiff, when a defendant raises the defense of qualified immunity, the plaintiff must show that the facts and inferences would allow a reasonable to juror to conclude that the defendant violated a clearly established constitutional right. *See Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020).

## B. False Arrest

### 1. Fourth Amendment

A warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Officer Ridener testified

during his deposition that he observed Woodhead lunge with extended arms at Officer Calvin Mattox as he began to arrest April Taylor. [Record No. 37, pp. 57-58] This fact is corroborated by both defendants' body cam footage, which Woodhead concedes is "accurate as video footage." [Record No. 48, p. 97; *see also* Record No. 34-34, Ridener BWC Video 17, 16:25; McKinney BWC Video 16, 24:43]

In response to the defendants' motion for summary judgment, Woodhead does not deny having engaged in this conduct or that such conduct constitutes an arrestable offense. Instead, he merely points out that he was charged with inciting a riot, disorderly conduct, and resisting arrest, rather than attempting to interfere with police duties or attempting to assault a police officer. [*See* Record No. 43-1, p. 4.] However, under Kentucky law, a person is guilty of resisting arrest when he "intentionally prevents or attempts to prevent a peace officer . . . from effecting an arrest of the actor *or another* by: (a) [u]sing or threatening to use physical force or violence against the peace officer or another; or (b) [u]sing any other means creating a substantial risk of causing physical injury to the peace officer or another." K.R.S. § 520.090 (emphasis added).

Probable cause to arrest for any offense precludes a false arrest claim. *Apsey v. Chester Twp.*, 608 F. App'x 335, 339 (6th Cir. 2015). An officer has probable cause for arrest if "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Courtright*, 839 F.3d at 521. Here, the defendants observed Woodhead voicing his displeasure with the arrests of protestors before lunging toward Mattox with outstretched arms as he attempted to place Taylor under arrest. Based on the undisputed testimony and video evidence, there is no question that Woodhead's

conduct constituted probable cause for arresting him for the offense of resisting arrest.[2] *See Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) (observing that, "[w]hen no material dispute of fact exists, probable cause determinations are legal determinations" for the court). It makes no difference that Woodhead was charged with different or additional conduct. *See Smith v. Peyman*, 93 F. Supp. 3d 738, 745 (E.D. Ky. 2015) (citing *Devenpeck*, 543 U.S. at 154).

Because no reasonable juror could conclude that the defendants violated Woodhead's constitutional right to be free from false arrest, the defendants are entitled to qualified immunity with respect to the plaintiff's false arrest claim under § 1983.

**2. State Law Claim for False Arrest and False Imprisonment**

Kentucky law recognizes no distinction between claims of false arrest and false imprisonment when considering claims involving law enforcement officers. *Lexington-Fayette Urban Cnty. Gov't v. Middleton,* 555 S.W.2d 613, 619 (Ky. Ct. App. 1977). Law enforcement officers enjoy a "privilege or immunity" to detain an individual when there is probable cause to believe that a crime was committed and that the individual to be detained committed it. *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007). Accordingly, the existence of probable cause to arrest Woodhead defeats his claim for false arrest/false imprisonment.

**C. Excessive Force**

**1. Fourth Amendment**

A law enforcement officer's right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490

[2] The Court rejects Woodhead's suggestion that his actions were permissible because Taylor's arrest was unlawful. In Kentucky, a conviction for resisting arrest does not require proof of a lawful arrest. *See Donovan v. Thames*, 105 F.3d 291, 298 n.8 (6th Cir. 1997) (citing Ky. Crime Commission/LRC Commentary 1974).

U.S. 386, 396 (1989). Determining whether a particular seizure is "reasonable" under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks omitted)).

Here, Woodhead asserts that the defendants used unreasonably excessive force when they placed him in a "chokehold" and "choke-slammed" him to the ground during his arrest. Specifically, he claims that he was grabbed from behind, and that an officer "wrapped an arm around [his] neck and [his] throat," before "more arms" grabbed him and "torque[d] [his] body in various directions." [Record No. 48, pp. 95-96] Woodhead reports that he was then "slammed to the ground," where he had "knees on [his] back" and "knees on [his] legs" and "was face down on the concrete." *Id.* at p. 96. He was on the ground for a "relatively short" duration before the officers stood him up forcefully.[3] *Id.* at p. 133.

Defendant Ridener described the events differently. He testified that, when he saw Woodhead lunging at Mattox, he "reacted quickly by grabbing Mr. Woodhead's upper chest for the purpose of removing his arms from the reach of Officer Mattox." [Record No. 37, p. 57] Ridener explained that, based on Woodhead's "quick lunge" and extended arms, he believed that Woodhead was attempting to harm Mattox and prevent him from arresting Taylor. Accordingly, Ridener attempted to displace Woodhead's balance by grabbing his upper chest and shoulders while using his leg "to displace the balance behind his body."

---

3 It is unclear how Woodhead came to identify the defendants as the officers involved in his arrest. [*See* Record No. 48, p. 132-33.] Woodhead did not specify each officer's alleged conduct in his deposition, but stated that Ridener "has a very distinct tattoo on his arm." *Id.* at p. 133.

However, this technique was unsuccessful because Woodhead continued to change position. McKinney then grabbed Woodhead's upper body and used his body weight to displace Woodhead, causing him to fall to the ground. McKinney was then able to grab Woodhead's left arm and Ridener applied handcuffs. *Id.* at p. 58.

Summary judgment generally is improper if the legal question of immunity turns on which version of the facts is accepted as true. However, the Court is not required to accept the plaintiff's version of the facts when it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). And the Court "may not adopt a version of the facts that is 'blatantly contradicted' by video footage that is not 'doctored or altered in any way' and which clearly 'depicts . . . [the events that] actually happened." *LaPlante v. City of Battle Creek, Michigan*, 30 F.4th 572, 578 (6th Cir. 2022); *see also Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (observing that courts should not adopt the nonmovant's version of events when it is blatantly contradicted by video evidence).

Woodhead's arrest was recorded on both Ridener's and McKinney's respective body-worn cameras, and Woodhead does not challenge the accuracy of that footage.[4] The video footage from McKinney's body camera is particularly revealing, as it provides a frontal view of Ridener's seizure of Woodhead from behind. [Record No. 34-34, McKinney BWC Video 16, 24:43. *See also* Ridener BWC Video 17, 16:28-16:34.] Although the events unfolded very

4 Woodhead has introduced various "screenshots" depicting his arrest. [*See* Exhibits to Record No. 42.] It is unclear whether they are still images taken from the officers' body cam footage or photographs taken by an unidentified third party. Regardless, they are consistent with the body cam footage.

quickly (roughly five seconds from initial contact until Woodhead was taken to the ground), it is clear that Woodhead was not placed in a "chokehold" under any conceivable definition of that term.

Upon initial contact, Ridener's body was facing Woodhead's right side. Ridener's forearm briefly rested on Woodhead's left shoulder and against the left side of his neck; his upper arm was in front of Woodhead's neck but does not appear to be touching it. Ridener then laid the crook of his elbow on Woodhead's chest, as he apparently attempted to perform a leg sweep maneuver. [Record No. 34-34, McKinney BWC Video 16, 24:44] When that technique was unsuccessful, he positioned himself behind Woodhead and appeared to place both arms in front of Woodhead's chest. At that point, Woodhead was taken to the ground, where he struggled with the officers briefly as they attempted to get him into the prone position. [*Id.* at 24:47-24:54] The defendants advised Woodhead to stop resisting, placed him in handcuffs, and brought him to his feet.[5] *Id.* The entire incident occurred in less than 30 seconds.

The Court applies an "objective reasonableness" standard to determine whether an officer's use of force in effecting an arrest is excessive in violation of the Fourth Amendment. *Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 388). The standard asks whether the officers' actions were objectively reasonable in light of the facts and circumstances they faced, without regard to their underlying intent or motivation. *Id.* The relevant inquiry is "reasonableness at the moment" of the use of force, as "judged from the

---

[5] Ridener's right knee can be seen on Woodhead's left buttock/upper thigh area as he is being handcuffed. [Record No. 34-34, Ridener BWC Video 17, 16:50]

perspective of a reasonable officer on the scene." *Id.* The Court considers the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, and whether the suspect was actively resisting arrest. *Id.* (citing *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006)).

The Court begins by examining the severity of the alleged crimes and whether Woodhead posed an immediate threat to the safety of officers or others. Woodhead was charged with inciting a riot, disorderly conduct in the second degree, and resisting arrest. These charges remain pending in Fayette District Court, Case Number 20-M-3571. While these misdemeanors might not constitute the *most* serious offenses, their weight should not be unduly diminished, as they occurred in the midst of a volatile atmosphere with a large number of protestors. And even if Woodhead's resisting arrest charge is based on his resistance of his own arrest (as he suggests), officers are not restricted to considering the criminal activity with which the defendant is ultimately charged. Instead, they also may consider additional criminal activity they reasonably perceive at the time force is employed. *See Kapuscinksi v. City of Gibraltar*, 821 F. App'x 604 (6th Cir. 2020); *Moody v. City of Newport News, Virginia*, 193 F. Supp. 3d 530, n.16 (E.D. Va. 2016). This factor weighs in favor of the officers' use of force.

Regarding the second factor, Woodhead's actions gave the defendants reasonable concern for the safety of Officer Mattox. Woodhead displayed an aggressive demeanor through his words and body language, as he shouted expletives at officers in close physical proximity to them. Ridener observed Woodhead scream and lunge toward Officer Mattox as Mattox attempted to place handcuffs on April Taylor. [Record No. 37, p. 57; Record No. 34-34, McKinney BWC Video 16, 24:43] While Woodhead maintains that he was merely attempting to film the events and did not recall touching Mattox, he concedes, without

explanation, that his hand was extended as he approached Mattox. [Record Nos. 48, p. 113; 43-1, p. 14] The defendants' concern for the safety of Officer Mattox and others was reasonable and this factor also weighs in favor of the application of force.

Finally, the Court considers whether Woodhead was actively resisting arrest. As previously noted, a person is guilty of resisting arrest in Kentucky when he or she intentionally prevents or attempts to prevent an officer from effecting the arrest of himself or another by using or threatening to use physical force against the officer. K.R.S. § 520.090. Officers reasonably believed that Woodhead was attempting to prevent the arrest of April Taylor through the use of physical force. Woodhead made his opposition to the arrests of other protestors known to police and attempted to physically place himself between Mattox and Taylor.[6]

It is also reasonable for officers to have concluded that Woodhead resisted his own arrest. Body cam footage indicates that Woodhead struggled with officers for the first several seconds of their encounter. [McKinney BWC Video 16, 24:45-24:55] Woodhead's deposition testimony corroborates this, as he claimed that when Officer Ridener seized him initially, he did not know who was grabbing him and thought it might have been another protestor. [Record No. 48 at p. 126] Woodhead stated that he was concerned that he was going to get injured, so he was "sure [he] was moving to try to make sure that [he] was not getting hurt in the process." *Id.* He further testified that, "[o]nce it was made clear that [he] was being placed under arrest, then [he] knew it was police." However, while Ridener seized Woodhead from behind, at least

---

6 During the arrest of another protestor moments earlier, Woodhead stood nearby, shouting, "No! This is ridiculous!" He also exclaimed that the arrest was for "no reason" and officers were "being selective." [Ridener BWC Video 17, 14:42-15:00]

one other officer (presumably McKinney), in addition to Mattox, assisted from the side, and all officers were wearing uniforms. [McKinney BWC Video 16, 24:44] Based on Woodhead's actions in the presence of uniformed officers, the defendants could have reasonably believed that Woodhead intentionally attempted to prevent his own arrest. This factor also weighs in favor of the officers' application of force.

The "ultimate question is whether the totality of circumstances justifies a particular sort of seizure." *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). Here, the force employed was relatively minimal when considered in light of the defendants' perceived need to stop Woodhead from harming Officer Mattox and/or interfering with the arrest of April Taylor. Defendant Ridener testified with respect to his training regarding the Lexington Police Department's resistance control continuum. Pursuant to this policy, Woodhead's conduct was considered "active aggressive," and permissible responses included pepper spray, pepper ball rounds, "impact weapon strike to non-vital area," baton arm bar, and take down. [Record No. 37, pp. 26-27] According to Ridener, the officers performed a takedown, consistent with the policy, which Woodhead does not challenge.

Woodhead claims that the defendants placed him in a "chokehold" or "choke-slammed" him to the ground. However, he does not define these terms and has failed to identify any police practices expert who would explain them to a jury or otherwise opine that the defendants violated any particular standard of conduct. Officer Ridener testified during his deposition that he understood a chokehold to be placing an arm around someone's neck and squeezing. [Record No. 37, at p. 34] He explained that the Lexington Police Department does not allow chokeholds to be used. *Id.*

Woodhead made a vague reference to having had trouble breathing at some point during his arrest, but the video evidence reveals that no direct or sustained pressure was applied to the front of Woodhead's neck or throat. And while he contends that he was "slammed" to the pavement, he does not identify any injuries that required medical attention. *But see Courtright v. City of Battle Creek*, 839 F.3d 513, 519 (6th Cir. 2016) (observing that plaintiff need not suffer severe physical injury to maintain excessive force claim). The use of a leg sweep maneuver has been deemed reasonable when officers have reason to believe that a suspect "could lash out and harm them." *See Phillips v. Blair*, 786 F. App'x 519, 530 (6th Cir. 2019). Likewise, the brief placement of an officer's knee on a resisting detainee's back or legs does not constitute excessive force under these circumstances. *See Jenkins v. Ann Arbor Police Dep't*, 2009 WL 185721, at *4 (E.D. Mich. 2009). Based on the foregoing analysis, no reasonable juror could conclude that the defendants violated the plaintiff's right to be free from excessive force.

Woodhead has not raised a genuine issue of material fact that either of the defendants used excessive force in effecting his arrest. Further, he has not demonstrated a clearly established constitutional right to be free from the treatment he alleges. Instead, he refers to a host of cases indicating that the use of a chokehold on an unresistant—or even initially resistant—individual constitutes excessive force under the Fourth Amendment. *See Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 540-41 (6th Cir. 2015); *Degolia v. Kenton County*, 381 F. Supp. 3d 740, 761-62 (E.D. Ky. 2019); *Hanson v. Madison Cnty. Detention Ctr.*, 736 F. App'x 521, 532-33 (6th Cir. 2018) (citing *Griffith v. Coburn*, 473 F.3d 650, 657, 660 (6th Cir. 2007)); *Laury v. Rodriguez*, 659 F. App'x 837, 845-46 (6th Cir. 2016) (holding that officers were not entitled to qualified immunity based on use of force in booking room following arrest). But

none of these cases involve (or are analogous to) the application of a chokehold on a defendant who lunged angrily toward a police officer or attempted to interfere with the arrest of another.

While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). With respect to the defendants' attempted use of a leg sweep, Woodhead relies on the Sixth Circuit's decision in *Pershell v. Cook*, 430 F. App'x 410 (6th Cir. 2011). There, officers responding to a 9-1-1 call decided to serve an arrest warrant on the plaintiff. One of the officers pointed a taser at Pershell upon entering his home and told him that he was under arrest. Pershell ordered the officer to get out of his house. At some point, three state troopers entered the house and, after informing him of the basis for his arrest warrant, "knocked [Pershell's] legs out from under him using a leg sweep." *Id.* at 412. Pershell was then handcuffed while lying on the ground. Thereafter, Pershell felt a forceful impact on his left foot and ankle followed by a blow to his left side. He was transported to jail in a wheelchair and subsequently diagnosed with a hip fracture. *Id.* at 413.

The district court denied the defendant-officers' motion for summary judgment based on qualified immunity. The Sixth Circuit affirmed the decision, concluding that the officers' administration of force after Pershell was on the ground was objectively unreasonable, since he was completely neutralized and thus posed no danger to police or others. *Id.* at 415. The court also found that using a leg sweep to knock Pershell onto the floor was objectively unreasonable because he "did not resist arrest or pose an immediate danger to officers at the time he was knocked to the ground." *Id.* Unlike Woodhead, who lunged and extended his

arms toward Officer Mattox, Pershell's "hands hung by his sides" and he did not swing or strike at officers.

The Sixth Circuit has determined that the use of takedown maneuvers may amount to excessive force in certain situations. *See LaPlante*, 30 F.4th at 581 (denying qualified immunity where officers used takedown technique resulting in elbow dislocation and fracture when suspect was not clearly resistant); *Harris v. City of Circleville*, 583 F.3d 356, 365-66 (6th Cir. 2009) (denying qualified immunity where officers employed takedown technique after suspect was already handcuffed within police station); *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (concluding that jury could find use of takedown maneuver objectively unreasonable where suspect "made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that he would 'go easy'"); *Pershell*, 430 F. App'x at 415 (denying qualified immunity where, after performing a leg sweep and handcuffing a suspect, officers struck the suspect three times, causing him to lose consciousness and sustain a hip fracture); *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) (denying qualified immunity where video footage would allow jury to find that officer threw the suspect to the floor in booking room after the suspect insulted the officer and refused to comply with orders); *Meirthew v. Amore*, 417 F. App'x 494, 497-98 (6th Cir. 2011) (denying qualified immunity where officer used an arm-bar technique in police station booking room and suspect was unarmed, handcuffed, and surrounded by officers). However, under the present circumstances, the defendants cannot be said to have violated any clearly established constitutional right. Accordingly, they are entitled to qualified immunity.

**2. State Law Battery**

Woodhead claims that the defendants' use of force during his arrest constituted battery. Kentucky law provides public officials with qualified official immunity from liability for "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity applies when public officials perform "(1) discretionary acts or functions . . . (2) in good faith; and (3) within the scope of the employee's authority." *Id.* If the act was discretionary and within the scope of the official's authority, the burden shifts to the plaintiff to provide evidence that the act was not performed in good faith. *Id.* at 523.

Kentucky law permits officers to use reasonably necessary force to make an arrest. *See* K.R.S. § 503.090. The amount of force required to effect an arrest is discretionary and within the scope of the defendants. *Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (citing *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008)). As previously determined, the defendants' use of force did not constitute a violation of a clearly established constitutional right in this case. And while Woodhead offers no specific argument that the defendants acted in bad faith, the body cam footage refutes any suggestion that they did. *See id.* The application of force was not gratuitous and lasted no longer than necessary to place Woodhead under arrest. Accordingly, the defendants are entitled to qualified immunity.

**C. First Amendment Claim**

Woodhead claims that he was arrested in retaliation for the content of his speech. A claim of retaliation based on the First Amendment requires proof that: "'(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would

deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between' the first two elements, *i.e.,* 'the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Hartman v. Thompson*, 931 F.3d 471, 483-84 (6th Cir. 2019) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

The defendants do not dispute that Woodhead engaged in protected activity when he protested from the sidewalk. [Record No. 34-43, p. 13] They also concede that an unlawful arrest could be sufficient to deter a person of ordinary firmness from engaging in free speech. *Id.* However, the defendants correctly point out that "probable cause to make an arrest defeats a claim that the arrest was in retaliation for speech protected by the First Amendment." *Hartman*, 931 F.3d at 484 (quoting *Nieves v. Bartlett*, —U.S.—, 139 S. Ct. 1715, 1721 (2019)). As previously explained, based on his interference with April Taylor's arrest, there is no genuine issue of material fact that probable cause existed to arrest Woodhead. Woodhead has failed to address this argument or the controlling authority in his response to the defendants' motion for summary judgment. [*See* Record No. 43-1, p. 16 (citing *Worrell v. Henry*, 2019 F.3d 1197 (10th Cir. 2000) for elements of retaliation claim).] Based on the foregoing, the defendants are entitled to summary judgment with respect to the First Amendment retaliation claim.

**IV.**

For the reasons outlined in this Memorandum Opinion and Order, it is hereby

**ORDERED** that the defendants' motion for summary judgment [Record No. 34] is **GRANTED**. All costs and expenses incurred by the defendants in this proceeding will be taxed against the plaintiff.

Dated: June 8, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky